**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 11-22621-CIV-SIMONTON**

**VINCENT J. BAZAIN,**

              **Plaintiff,**

**v.**

**CAROLYN W. COLVIN, Acting Commissioner
of Social Security Administration,**

              **Defendant.**

_____/

<u>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**</u>

          This matter is before the Court on the cross-motions for summary judgment filed by Plaintiff Vincent J. Bazain ("Plaintiff") and by Defendant Carolyn W. Colvin, Acting Commissioner of Social Security Administration ("Defendant"). ECF Nos. [37] and [39]. This matter was referred to the undersigned Magistrate Judge pursuant to the Parties' Consent to Jurisdiction by United States Magistrate Judge, Order Referring Case to Magistrate, and Clerk's Notice Reassigning Case. ECF Nos. [15] [19] [31].  The summary judgment motions are now ripe for disposition.

          For the reasons stated below, the Plaintiff's Motion for Summary Judgment, ECF No. [37] is **DENIED**, Defendant's Motion for Summary Judgment, ECF No. [39] is **GRANTED**, and that the decision denying benefits is **AFFIRMED**.

          I.      <u>**BACKGROUND**</u>

          On December 18, 2006, the Plaintiff filed an application for a period of disability and disability insurance benefits, alleging disability beginning July 1, 2006.[1] (R. 21).  The

_____

[1]  The letter "R," followed by a page number is used to designate a page in the Administrative Record, which is contained in ECF No. [10].

claim was denied initially on February 28, 2007, and upon reconsideration on June 21, 2007.  (R. 21).  On July 16, 2009, a video hearing was held in front of an Administrative Law Judge ("ALJ"). (R. 21).  At the hearing, the ALJ heard testimony from an impartial vocational expert, Dian L. Haller, and the Plaintiff, who was represented by counsel. (R. 21).  On September 15, 2009, the ALJ concluded that the Plaintiff was not disabled under section 1614(a)(3)(A) of the Social Security Act since July 1, 2006, through the date of September 15, 2009, pursuant to 20 C.F.R. § 404.1520(g). (R. 29).

The Plaintiff requested review from the Social Security Administration Appeals Council, which denied review on April 27, 2011.  (R. 1).  The Appeals Council, on May 18, 2011, set aside its earlier review to consider additional information which consisted of a member profile from Express Scripts dated January 1, 2009 through December 31, 2010; however, the Appeals Council once again denied review of the ALJ's decision.  (R. 1). Having exhausted all administrative remedies, and Plaintiff timely filed the pending Complaint seeking judicial review of the administrative proceedings pursuant to 42 U.S.C. § 405(g).  ECF No. [1].

II.     LEGAL ISSUES PRESENTED

Plaintiff claims that the ALJ committed the following errors, in determining that she was not disabled.  The first three errors concern the determination of Plaintiff's residual functional capacity; and the fourth error concerns the adequacy of the testimony of the vocational expert.

1.  The ALJ's finding that the Plaintiff has the ability to work is unsupported by the record as a whole.

2.  The ALJ's finding that Plaintiff had no mental impairment is not supported by the record as a whole.

3.  The ALJ's failure to review evidence that predates the date of onset of disability is an error of law and abuse of discretion.

**4. The ALJ committed an error of law by relying on the testimony of the vocational expert.**

ECF No. [37] at 4, 19, 31, and 36.

III.     <u>STANDARD OF REVIEW</u>

Judicial review of the ALJ's decision in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's factual findings and whether the correct legal standards were applied.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, (1971); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  "Substantial evidence" is more than a scintilla, but less than preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion.  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Bloodworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

When reviewing the evidence, the Court may not reweigh evidence or substitute its judgment for that of the ALJ, and even if the evidence "preponderates" against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence.  *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Baker v. Sullivan*, 880 F.2d 319, 321 (11th Cir. 1989).  This restrictive standard of review, however, applies only to findings of fact.  No presumption of validity attaches to the Commissioner's conclusions of law, which are reviewed *de novo*, including the determination of the proper standard to be applied in reviewing claims.  *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991) ("The Commissioner's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."); *Martin v. Sullivan*, 894 F.2d at 1529.

IV.   <u>FRAMEWORK FOR ANALYSIS</u>

The Social Security Administration applies a five-step sequential analysis to make a disability determination.  20 C.F.R. § 404.1520(a)(4).  The analysis follows each step in order, and the analysis ceases if at a certain step the ALJ is able to determine, based on the applicable criteria, either that the claimant is disabled or that the claimant is not disabled.

A.   <u>Step One</u>

Step one is a determination of whether the claimant is engaging in substantial gainful activity.  20 C.F.R. § 404.1520(b).  "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572(a).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized. 20 C.F.R. § 404.1572(b). If an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that she has demonstrated the ability to engage in substantial gainful activity.  20 C.F.R. §§ 404.1574, 404.1575. If an individual has been participating in substantial gainful activity, she will not be considered disabled, regardless of physical or mental impairment, despite the severity of symptoms, age, education, and work experience.  The analysis proceeds to step two if the individual is not engaging in substantial gainful activity.

In the case at bar, the ALJ found first that Plaintiff had not engaged in substantial gainful activity since July 1, 2006, the alleged onset date.  (R. 23).  This determination is not challenged.  The analysis proceeded to step two.

B.   <u>Step Two</u>

At the second step, the claimant must establish that she has a severe impairment. Step two has been described as the "filter" which requires the denial of any disability claim where no severe impairment or combination of impairments is present.  *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987).  This step has also been recognized as a

4

"screening" to eliminate groundless claims.  *Stratton v. Bowen*, 827 F.2d 1447, 1452 (11th Cir. 1987).  The ALJ makes a severity determination regarding a classification of the claimant's medically determinable impairment or combination of impairments.  20 C.F.R. § 404.1520(c). To be severe, an impairment or combination of impairments must significantly limit an individual's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1521(a).   An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. § 404.1521; Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p.  If the claimant does not have a severe medically determinable impairment or combination of impairments, she is not disabled and the analysis ends here.  If the ALJ finds that the claimant has a severe medically determinable impairment or combination of impairments, the process advances to the third step.

In the case at bar, the ALJ found that Plaintiff had the severe impairments of Carpal Tunnel Syndrome, Migraines, and Obesity, pursuant to 20 C.F.R. 404.1520(c).  The ALJ found that he did not have mental impairments, despite Plaintiff alleging that he suffered from depression and anxiety.[2]  (R. 23).  Since the ALJ found at least one severe impairment, however, the ALJ then proceeded to the next step.

C.     Step Three

The third step requires the ALJ to consider if Plaintiff's impairment or combination of impairments is at the level of severity to either meet or medically equal the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 ("the Listings").  A claimant is considered to be disabled if his impairment or combination of impairments: 1) is severe enough to meet or to medically equal the criteria of a listing; and 2) meets the

---

[2] The Plaintiff challenges the ALJ's consideration of his mental impairment during subsequent steps of the sequential evaluation.

duration requirement under 20 C.F.R. § 404.1509.  If the claimant's impairment or combination of impairments does not meet the criteria specified in the Listings, then the ALJ must proceed to the fourth step.

In the case at bar, the ALJ found that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (R. 24).  Plaintiff has not challenged the ALJ's determinations at this step.  The analysis then proceeded to step four.

###### D.   <u>Step Four</u>

Step four is a two-pronged analysis that involves a determination of whether the impairments prevent the claimant from performing his past relevant work.  First, the ALJ must determine the claimant's Residual Functional Capacity ("RFC") as described in 20 C.F.R. § 404.1520(e).  RFC measures a person's ability to do physical and mental work activities on a sustained basis despite limitations caused by their impairments.  In making this determination, the ALJ must consider all of the claimant's impairments, regardless of the level of severity. 20 C.F.R. §§ 404.1520(e), 404.1545; SSR 96-8p; *Tuggerson-Brown v. Comm'r of Soc. Sec.*, No. 13-14168, 2014 WL 3643790, at *2 (11th Cir. Jul. 24, 2014) (an ALJ is required to consider all impairments, regardless of severity, in conjunction with one another in performing the latter steps of the sequential evaluation).

In the case at bar, the ALJ found that the Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except claimant can frequently balance and stoop, occasionally climb ramps, stairs, ladders, ropes, and scaffolds, and can never kneel, crouch, or crawl.  Plaintiff can use his left hand occasionally to reach, handle, finger and feel.  (R. 24).  Plaintiff challenges the ALJ's determination at this step, and contends that the ALJ's finding that the Plaintiff had no impairment that would interfere with his ability to work is not supported by the record as a whole.

6

The second phase of step four requires a determination of whether a claimant has the RFC to perform the requirements of his past relevant work.  20 C.F.R. § 404.1565.  In the case at bar, the ALJ determined that Plaintiff was unable to perform any past relevant work.  (R. 27).  The determination that Plaintiff could not perform his past relevant work has not been challenged.  The analysis proceeded to step five.

      E.    <u>Step Five</u>

If the claimant is not able to perform his past relevant work, the ALJ progresses to the fifth step.  At this step, the burden of production shifts to the Commissioner to show that other work that the claimant can perform exists in significant numbers in the national economy.  *Jones v. Apfel*, 190 F.3d 1224, 128 (11th Cir. 1999); 20 C.F.R. § 404.1520(g).  In making this determination, the ALJ considers a claimant's RFC as determined in connection with step four, as well as the claimant's age, education, and work experience to determine if he can perform any other work.  20 C.F.R. § 404.1520(a)(4)(v).

In the case at bar, the ALJ considered Plaintiff's age, education, work experience, RFC, and, based on the testimony of a vocational expert ("VE") found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.  (R. 28).  Thus, the ALJ also concluded that the Plaintiff was not under a disability, as defined in the Social Security Act pursuant to 20 C.F.R. § 404.1520(g), from July 1, 2006, through the date of the ALJ's September 15, 2009 decision. (R. 29).

Plaintiff challenges this step of the analysis, arguing that the ALJ did not properly consider the testimony of the VE, and that the VE did not properly support her opinion regarding available jobs.

V.     **PLAINTIFF'S BACKGROUND**

    A.     **Medical History**

Plaintiff was born on May 22, 1960, and has a history of obesity, weighing around 330 pounds. (R. 195, 230, 273, 233).  He suffered from various orthopedic ailments and was treated by Robert P. Lonergan, MD.  Plaintiff underwent numerous orthopedic procedures that included:  bilateral trigger finger releases on each of his long fingers; ACL reconstruction revision of his right knee complicated by degenerative arthritis; left elbow lateral epicondylitis and surgery; and left shoulder impingement with AC joint degenerative disease and surgery on April 27, 2006. (R. 236-238).  Plaintiff was also diagnosed with arthralgias and osteoarthritis of the smaller joints of his hands; chronic Achilles tendonitis and calcific deposition into his right heel; and, a partial tear of his Achilles tendon around July 2006.  (R. 236-238).

On November 10, 2003, Dr. Lonergan determined that Plaintiff had reached maximum medical improvement following anterior cruciate ligament (ACL) surgery; provided him with a permanent partial impairment rating of 25%; and restricted him to lifting 40 pounds.  (R. 202).  Dr. Lonergan also restricted Plaintiff's walking, climbing, kneeling, and crouching but he did not define to what extent.  (R. 202).  Dr. Lonergan noted in the records that Plaintiff complained of headaches from a concussion that he sustained from an automobile accident, but he was not the treating doctor. (R. 237). Plaintiff suffered from a series of issues with his left elbow for left lateral epicondylitis and received treatments of injections of Depo Medrol and Lidocaine.  (R. 289). On October 5, 2007, Plaintiff saw Dr. Lonergan complaining of renewed left shoulder and elbow and right knee pain after being "fairly active." (R. 350). Dr. Lonergan provided Plaintiff with corticosteroid injections of his joints. (R. 350). On November 19, 2007, Plaintiff complained of left elbow and right ankle pain after he turned his ankle a few weeks before.  (R. 349).  Dr. Lonergan injected Plaintiff's left lateral epicondyle. (R.  349).

Plaintiff's ankle x-ray was unremarkable.  (R. 349). Dr. Lonergan diagnosed Plaintiff with a mild right ankle sprain.  (R. 349).

On March 24, 2008, Plaintiff saw Dr. Lonergan, complaining of right shoulder and elbow pain.  (R. 348).  The x-ray of Plaintiff's elbow showed a small traction spur along the lateral epicondyle but no other significant abnormalities.  (R. 348). Dr. Lonergan diagnosed bilateral lateral epicondylitis, right shoulder impingement syndrome, and subacromia bursitis. (R. 348). Dr. Lonergan provided corticosteroid injections to Plaintiff's right subacromial space and epicondyles. (R. 348).  On April 9, 2008, Plaintiff saw Dr. Lonergan, complaining of pain throughout his body (but particularly in his right knee) after a refrigerator fell on his right leg while he was moving it.  (R. 347).  Dr. Lonergan provided Plaintiff with a corticosteroid injection of his right knee and prescribed a Medrol Dose pack for his multiple joint arthralgia. (R. 347).  On April 23, 2008, Dr. Lonergan provided Plaintiff with a series of Supartz injections to his right knee, and referred him for physical therapy of his elbows and right knee. (R. 346).  On May 7, 2008, Plaintiff underwent right open carpal tunnel release and a partial lateral epicondylectomy of his left elbow. (R. 343). On May 16, 2008, Plaintiff reported his pain was very minimal and he was "quite pleased." (R. 342). On May 21, 2008, Plaintiff reported no problems or issues. (R. 341).

Plaintiff suffered from migraine headaches since 2004 after an accident when he working inside of his home and a steel pipe hit him in the face, requiring stitches.  (R. 43, 195-96).  He received sporadic relief from the headache pain through a variety of treatments that over the years that included medications Depakote, Decadron, Corgard, Amitriptyline, Indomethacin, and Zomig.  (R. 265-277, 278-286).  Michael H. Deshazo, MD treated Plaintiff for migraine headaches. (R. 241).  On September 5, 2006, Plaintiff saw Dr. Deshazo and reported some improvement but still complained of severe headaches that occurred for three days of the week.  (R. 232). Dr. Deshazo reviewed Plaintiff's MRI and

CT scans and reported that they were unremarkable. (R. 232). On October 3, 2006, it was reported that Plaintiff did well for two weeks following a DHE-45 infusion. (R. 230, 273). On January 15, 2007, Dr. Deshazo provided information on Plaintiff's condition reporting that he had not referred Plaintiff for any mental health treatment, and that Plaintiff had not been prescribed psychotropic medication.  (R. 240). Dr. Deshazo did not identify any mental status abnormalities stemming from the headaches that impacted Plaintiff's work or work-like functioning, such as problems with his memory, thinking, or concentration. (R. 240).

On April 5, 2007, Dr. Deshazo reported that after receiving an I.V. of DHE-45, Plaintiff was "pretty well headache free for about 48 hours," was able to function; but, the headaches returned, though not as severe.  (R. 269, 283).  Despite Plaintiff's severe headaches with nausea and vomiting, Plaintiff traveled from Tennessee to Pennsylvania for two months.  (R. 232).  Dr. Deshazo opined that Plaintiff was unable to hold any type of employment given his complaints of "intractable" headaches.  (R. 268, 280).

Plaintiff was diagnosed with sleep apnea and vertigo as recorded in the records from The Family Physicians Group.  (R. 305, 307, 325)  Plaintiff was attended to by Dr. Lucius McGehee from American Sleep Medicine on September 12, 2007 and October 11, 2007; his records indicated that he had severe headaches, dizziness, and poor balance as well as obstructive sleep apnea and hypoxia.  (R. 325, 332, 333).

On January 13, 2009, Michael Nollner, M.D., from Family Physicians Group, completed a *Multiple Impairment Questionnaire* covering his treatment of Plaintiff from July 11, 2006 to January 8, 2009.  (R. 354-61). Dr. Nollner advised that he saw Plaintiff infrequently, every three to six months. (R. 354). Dr. Noller reported that Plaintiff's headache diagnosis was based largely on his "symptoms" because the MRI of his brain was nonspecific. (R. 355). Dr. Noller reported that Plaintiff complained of having headaches: 1) three to four times weekly; or, 2) every day of the month except for two or

10

three days. (R. 354-55). Dr. Noller felt that Plaintiff could not perform work on a sustained basis with his constant severe headaches. (R. 356-59).

On July 11, 2008, Plaintiff visited Manuel Carro, M.D. (Tr. 422-24). Plaintiff reported that he did not like to take pain medication; migraine medication made him "sick," so he only took Tylenol on an intermittent basis.  (R. 422). Dr. Carro diagnosed myofascial pain syndrome and chronic migraine headaches and provided Plaintiff with trigger point injections.  (R. 423-24). On August 8, 2008 Dr. Carro reported that Plaintiff was doing well from a physiotherapist standpoint.  (R. 420).

On September 4, 2008, Plaintiff reported that he and his wife were planning to adopt four children, as recorded in the Family Physicians Group records; these records also noted that Plaintiff received pain medication from a doctor in North Carolina, despite living in Tennessee.  (R. 470-471).  On October 29, 2008, Plaintiff returned to see Dr. Deshazo, whom he had not seen in about one and one-half years. (R. 418). Plaintiff complained of persistent severe headaches for several weeks.  (R. 418). Dr. Deshazo adjusted Plaintiff's medication. (R. 418-19).  On November 4, 2008, Plaintiff saw Dr. Carro. (R. 416-17). In addition to his migraine headaches and neck pain, Plaintiff now complained of an anxiety disorder and memory problems. (R. 417). Dr. Carro did not conduct a mental status examination. (R. 416-17). Dr. Carro's diagnostic impression included post-traumatic headaches, a memory disorder, anxiety, and cervical myofascial pain. (R. 418). Dr. Carro also ordered an MRI and neuropsychological testing to evaluate Plaintiff's memory, cognition, and mood.  (R. 418). The MRI of Plaintiff's brain was normal. (R. 410, 412-13). The MRI of his cervical spine revealed a disc osteophyte complex at C6-C7 that caused moderate stenosis but without cord compression or abnormal cord signal. (R. 414- 15). Dr. Carro provided Plaintiff with cervical epidural block injections on November 17, 2008 and December 15, 2008.  (R. 408-09, 411).

11

On December 18, 2008, Plaintiff visited Lance Wright, M.D., regarding his headaches. (R. 400-03). Plaintiff expressed some cognitive complaints due to his headaches, including poor memory, concentration, and difficulty functioning. (R. 400). He also claimed that his headaches impacted his mood. (R. 400-01). Dr. Wright diagnosed Plaintiff with a "mild" concussive injury. (R. 403). Dr. Wright did not perform any neuropsychological testing. (R. 400-03). Dr. Wright adjusted Plaintiff's medication because he was concerned that Plaintiff had triptan induced headaches. (R. 402-03).

### B.   Hearing Testimony

An administrative hearing was conducted via video conference on July 16, 2009 in Falls Church, Virginia, attended by Plaintiff, his counsel, and a vocational expert, Dian Haller. (R. 34-61). The Plaintiff attended from Marietta, Georgia. (R. 21). The Plaintiff, when asked by the ALJ to name his impairments, testified that migraines were what he suffered from the most. (R. 36). He testified that his migraines lasted four to five days but sometimes less, sometimes more, and the pain ranked at a level of ten. (R. 36). Plaintiff later testified that he experienced migraine pain every day. (R. 38-39). Plaintiff also testified that he had elbow surgeries, hand surgeries, carpal tunnel surgeries, six knee surgeries, and had been hit in the head. (R. 37). Plaintiff testified that his hands were numb and that his wife usually helped him button his shirt, that he dropped and broke things, and that he was unable to write a letter. (R. 38). He testified that his wife took care of all of the bills, paid for everything for him, and he approximated that she earned $60,000 or $70,000 per year running her own recruiter training company. (R. 40). Plaintiff testified that he took the medication Toradol, for migraine pain; and, that he was uncomfortable sitting too long in a chair or standing too long. (R. 39). Plaintiff testified that he had a good wife, and that he missed being a police officer. (R. 40). Plaintiff testified that he resigned from being the police chief for a small town because of his migraine headache pain which caused him to forget things sometimes and lose his train

of thought. (R. 41). Plaintiff testified that he did not see any doctors or psychologists from the police department because his migraines were not work related.  (R. 45-46).

When asked by the ALJ how much weight he could carry comfortably, Plaintiff testified that he did not know, but that he helped his wife around the house with plates and clothing.  (R. 41-41).  Plaintiff testified that he could not carry a gallon of milk and that he constantly dropped things, and that his migraine medication made him sleepy. (R. 42).  Plaintiff testified that the headaches started in 2003 when he was working in his house with a friend when a steel pipe hit his face, lacerating it, and requiring him to have 300 stitches.  (R. 42-43, 48).  Plaintiff testified that he did not have medical records of the incident because it happened in 2003.  (R. 48).  His attorney stated on the record that he did not believe he tried to get the records because that incident happened much earlier than Plaintiff's offset of alleged disability date.  (R. 48).  The ALJ questioned Plaintiff about a brain injury that was listed on Plaintiff's application, and the Plaintiff's attorney stated, "he's not mentioning a brain injury." (R. 43).  Later on in the hearing, Plaintiff's attorney stated that he "wasn't alleging brain damage."  (R. 44).

In response to questioning by his own attorney, Plaintiff testified that he also had a head injury from a motorcycle accident in the late 1990s or early 2000, but returned to work after that.  (R. 49, 53).  When questioned by the ALJ as to why he waited until 2006 to apply for disability when he alleged he became disabled in 2003, the Plaintiff testified that, "this is very humiliating for a man, sir." (R. 51).

VI.    **PLAINTIFF'S ABILITY TO WORK**

    A.    **Introduction**

The ALJ made the determination that the Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except the Plaintiff could frequently balance and stoop, occasionally climb ramps, stairs, ladders, ropes, and scaffolds, and could never kneel, crouch, or crawl.  The ALJ found that Plaintiff could

also use his left hand occasionally to reach, handle, finger, and feel.  (R. 24).  Plaintiff argues that the ALJ's finding that the Plaintiff has the ability to work is unsupported by the record as a whole.  ECF No. [37] at 19.

### B.    The Framework for Analyzing Residual Functional Capacity

Social Security Ruling ("SSR") 96-8p sets forth the way in which an ALJ is required to assess the RFC of a claimant. The RFC is the assessment of a claimant's ability to perform physical and mental activities in a work setting for 8 hours a day, 5 days a week.  In assessing the RFC, the ALJ is required to consider limitations and restrictions imposed by all of the claimant's impairments, even those that are not "severe."  As explained in SSR 96-8p, even though an impairment may not be considered severe when standing alone, it may be critical to the outcome when considered in combination with limitations and restrictions due to other impairments.

Social Security Ruling 96-8p expressly requires the ALJ to consider both the exertional and nonexertional capacity of a claimant.[3]  A claimant's mental limitations are considered part of nonexertional limitations.  The ALJ must rate the degree of Plaintiff's functional limitations based on the extent that his mental impairments interfere with his ability to function independently, appropriately, effectively, and on a sustained basis.  20 C.F.R. § 404.1520a.

Therefore, the ALJ must provide an analysis of all of the claimant's limitations in order to conduct the appropriate step four determination regarding whether the Plaintiff could perform his past relevant work, and if not, the step five analysis regarding the

---

[3] "Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands:  Sitting, standing, walking, lifting carrying, pushing, and pulling.  . . . [n]onexertional capacity considers all work-related limitations and restrictions that do not depend on an individual's physical strength; i.e., all physical limitations and restrictions that are not reflected in the seven strength demands and mental limitations and restrictions."  SSR 96-8p.

availability of other jobs he could perform.  In this regard, the ALJ is required to provide an analysis of any credibility determination, to evaluate the opinions of treating physicians and establish good cause if they are not given controlling or considerable weight, and account for all non-exertional impairments in the RFC finding.

The regulations define RFC as what an individual can still do, despite any limitations caused by his or her impairments. 20 C.F.R. § 404.1545(a).  This determination takes into account all relevant evidence, including the medical evidence, the claimant's own testimony, and the observations of others. 20 C.F.R. § 404.1545(a).  *Levy v. Astrue*, No. 07-80157, WL 4753518 *1 (S.D. Fla. Oct. 28, 2008).

C.     ALJ's Findings

In making his RFC assessment, the ALJ considered all symptoms and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSRs 96-4p and 96-7p.  (R. 24).  The ALJ also considered opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.  (R. 24).

The ALJ, in assessing Plaintiff's left shoulder and left arm, found that the record over all reflected improvements in Plaintiff's condition despite statements by physicians that Plaintiff had a disability.  (R. 26).  In November of 2003, Dr. Lonergan found Plaintiff to have a permanent partial impairment rating of 25% after an ACL revision with degenerative arthritis.  (R. 26, 202).  Five years later, in June 2008, Dr. Lonergan reported that Plaintiff

> returns today and is pleased overall.  His knee is feeling better and his elbow and wrist are also feeling better.  In general, he feels pretty good at this point in time. On exam his knee shows excellent range of motion and is not particularly tender here today.  Likewise his elbow and wrist all show very nicely healing wounds and no significant pain.

(R. 26, 240). On that date, Dr. Lonergan also noted that Plaintiff's right knee osteoarthritis was improving, and the right elbow status post lateral epicondylar release and right carpal tunnel release, were doing well.  (R. 26, 240).

The ALJ also considered Dr. Lonergan's January 5, 2007 letter to Plaintiff's counsel where he listed Plaintiff's "several different ailments" for which he underwent "numerous orthopedic procedures," during the time period between October 2003 through August 2006.  (R. 237).  These included ACL reconstruction revision of his right knee; bilateral trigger finger released on each of his long fingers; left elbow lateral epicondylitis with surgery; arthralgias and osteoarthritis of the smaller joints of his hands; chronic Achilles tendonitis; and calcific deposition into his right heel that gives him pain; left shoulder impingent with AC joint degenerative disease with arthroscopic surgery with a subacromial decompression and distal clavicle resection procedure; a partial tear of his Achilles tendon; and, Dr. Lonergan reported that Plaintiff took over the counter medications for his joint pain; and, headaches.  (R. 26, 237, 238).

The ALJ noted that Dr. Lonergan failed to discuss any limitations, if any, that the Plaintiff experienced in connection with these conditions and procedures.  (R. 26). Moreover, the ALJ found that since Dr. Lonergan reported that Plaintiff took several over the counter, non-prescription medications for pain, this suggested that while Plaintiff did experience pain, he was able to get relief.  (R. 26).  The ALJ also noted that several times in the record, the Plaintiff received injections of medications for pain in various parts of his body, which worked.  Further, Plaintiff requested refills of medications that worked and stopped using those that did not.  (R. 26, 298-324).

The ALJ found that the record contained evidence of the Plaintiff's "overuse of a cocktail of herbal supplements and medication" which may have been contributing to an exacerbation of his pain or causing new painful conditions.  (R. 26).  Dr. Lonergan's notes from August 15, 2006 document that Plaintiff was on numerous different

medications, supplemental and herbal and different anti-inflammatory medications; and, that Plaintiff needed to stop taking all of these medications because they could be "contributing to his discomfort and having interactions." (R. 26, 221, 302).  Another one of Plaintiff's treating physicians, Dr. Wright, noted that he was concerned that Plaintiff was having a triptan induced rebound headache, and he wanted Plaintiff to change medications to eliminate all triptans.[4]  (R. 374, 432).

The ALJ noted that the records did not reflect that the Plaintiff received treatment for back pain for at least 12 months and the physical exams showed minimal limitations in his back (394, 423).  Dr. Lonergan's letter dated January 2007 omitted any discussion of a back condition.  (R 235-239).  An x-ray of Plaintiff's cervical spine showed reasonably good disc space maintenance without any acute significant abnormalities. (R. at 345).

### 1.     Evidence Supporting the ALJ's RFC Findings

Plaintiff's medical files were reviewed by several state agency reviewing doctors. The ALJ assigned significant weight to the opinions of Dr. Walwyn and Dr. Allison, state agency physicians, as he found that the evidence fully supported their diagnoses relating to Plaintiff's condition and physical abilities, and satisfied the ALJ's conclusion to the Plaintiff's lack of disability.[5]  (R. 27).  The ALJ also assigned significant weight to the medical opinion of one of Plaintiff's treating physicians, Dr. Carro. (R. 27).

---

[4] **This note dated December 23, 2008 was signed by Lance J. Wright MD and not Dr. Carro, as the ALJ has attributed it.  (R. 374, 432).**

[5] The undersigned notes that the Plaintiff has not argued that the ALJ did not give controlling weight to any of the opinions of Plaintiff's treating physicians under the treating physician rule.  The ALJ gave treating physician Dr. Carro's medical opinion significant weight.  The ALJ gave the treating physician opinions of Dr. Deshazo and Dr. Lonergan some weight to the extent they were consistent with the record; and assigned little weight to the conclusory opinions of the treating physicians Dr. Deshazo, Dr. Lonergan, and Dr. Nollner, for the findings of disability, which were inconsistent with the evidence and with Plaintiff's statements.  (R. 27).  No treating physician provided any formal detailed assessment of the Plaintiff's physical or mental functional capacities. The undersigned finds that the ALJ's accordance of weight to all of the medical opinions is supported by substantial evidence.  In *Rosario v. Comm'r of Soc. Sec.*, 490 F. App'x

On February 22, 2007, Lloyd Walwyn, M.D., a state agency physician consultant reviewed Plaintiff's file. (R. 243-50). Plaintiff argues that Dr. Walwyn failed to include the medical evidence of record that supports Plaintiff's application when completing his RFC Assessment. Dr. Walwyn opined that Plaintiff's migraines, obesity, left shoulder history, and plantar fascia did not prevent him from performing medium work that required more than frequent left upper extremity reaching. (R. 243-47). Dr. Walwyn completed a Physical Residual Functional Capacity Assessment and found that Plaintiff could occasionally lift 50 pounds; frequently lift 25 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; push and/or pull (including operation of hand and/or foot controls) limited in the upper extremities. (R. 243-250). Regarding postural limitations, Dr. Walwyn found that Plaintiff could frequently climb ramps/stairs; balance; stoop; kneel; crouch; crawl; and, occasionally climb ladders/ropes/scaffolding. (R 245). Plaintiff had limited ability to reach in all directions (including overhead); and, had unlimited ability for handling (gross manipulation); fingering (find manipulation); feeling (skin receptors). (R. 246). Plaintiff had no visual limitations; no communicative limitations; no environmental limitations. (R. 246, 247). Dr. Walwyn noted that the treating or examining source did not provide a statement regarding the claimant's physical capacities. (R. 249).

On June 20, 2007, Joe G. Allison, M.D. prepared a Physical Residual Functional Capacity Assessment. (R. 290-297). Plaintiff argues that Dr. Allison's RFC Assessment

192, 194-95 (11th Cir. 2012), the Eleventh Circuit found that the ALJ had not erred in giving little weight to the opinions of the claimant's treating psychiatrist, where the ALJ indicated she had done so "because they were inconsistent with [the doctor's] own findings, notes from the treatment plan, and the overall medical evidence," and the decision noted one example from the medical records. 490 F. App'x at 194-95. *Accord Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (ALJ's rejection of treating physician's opinion was supported by substantial evidence where ALJ cited examples of inconsistencies with treatment notes and claimant's own admissions of what she could do). The ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion. *Bloodsworth v. Heckler*, 703 F.2d 278, 279 (11th Cir. 1987).

was incomplete and inaccurate.  ECF No. [37] at 15-19.  Dr. Allison found that Plaintiff could occasionally lift and/or carry (including upward pulling) 50 pounds; frequently lift and/or carry (including upward pulling) 25 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an 8 hour workday; sit (with normal breaks) for a total of about six hours in an eight hour workday; push and/or pull (including operation of hand and/or foot controls) limited in upper extremities.  (R. 291).  Dr. Allison found that Plaintiff could frequently climb ramps and stairs; balance; stoop; kneel; crouch; crawl; and occasionally climb ladder, rope or scaffolds.  (R. 292).  Plaintiff had limited reaching in all directions (including overhead); and unlimited handling, fingering, feeling.  (R. 293). Plaintiff had no visual limitations; no communicative limitations; and no environmental limitations.  (R. 293-293).  Dr. Allison noted that there were treating or examining source statements regarding the Plaintiff's physical capacities in the file and that those conclusions were not significantly different from his findings.  (R. 296).

After reviewing the record, the undersigned finds that regarding the opinions of Dr. Walwyn and Dr. Allison, both were supported by the medical evidence in the record, and Plaintiff's contrary statements were found by the ALJ to lack in credibility.

## 2.    Introduction to Assessing Credibility

The ALJ must follow a two-step process where it first must be determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that could be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms.  (R. 24).  Once this is shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent that these limit Plaintiff's functioning.  (R. 24).  If statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not

19

substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on a consideration of the entire case record.  (R. 24).

The responsibility of the fact-finder, the ALJ, is to weigh the Plaintiff's complaints about his symptoms against the record as a whole; this falls to the ALJ alone to make this determination.  20 C.F.R. § 404.1529(a).  A clearly articulated credibility finding supported by substantial evidence in the record will not be disturbed by a reviewing court.  *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995). "[T]he ALJ's discretionary power to determine the credibility of testimony is limited by his obligation to place on the record explicit and adequate reasons for rejecting that testimony."  *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).  If the ALJ decides not to credit such testimony, he must articulate explicit and adequate reasons for doing so.  *Hale v. Bowen*, 831 F. 2d 1007, 1011 (11th Cir. 1987).  For this, the ALJ must examine the entire record.  (R. 21).

### 3.    ALJ's Credibility Determination

Here, the ALJ adopted in full Plaintiff's subjective allegations regarding the severity of his impairments.  (R. 24).  The ALJ found that the Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  However, Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were found not credible to the extent they were inconsistent with the ALJ's residual functional capacity assessment.  (R.  24).  Lloyd A. Walwyn, M.D. a state agency reviewing doctor, in completing the Physical Residual Functional Capacity Assessment, found that regarding the Plaintiff's severity of symptoms, that the Plaintiff's allegations were "partially credible."  (R. 248).

The ALJ found that the Plaintiff alleged he left his police officer job and the police department because of his migraines which started in January 2003.  (R. 24).  Plaintiff also claimed that he was disabled at that time, but took a job with his wife's recruiting firm for the next three years.  (R. 25).  Based on this, the ALJ considered Plaintiff's claims

of disabling migraines, and found these to be exaggerated as the migraines were not disabling.  (R. 25).  The ALJ found that the Plaintiff's disability allegations were not credible; and, that claimant could engage in the work activity as defined by the RFC assessment outlined above, which was supported by the objective medical evidence presented.  (R. 27).  The undersigned finds that the ALJ's credibility determination is supported by substantial evidence.

### 4.   No Evidence Supports Plaintiff's Allegations of Mental Impairment

The ALJ specifically found that that Plaintiff had no mental impairment.  (R. 23). The ALJ had few records to review that could even arguably support any mental impairment; these records consisted of Plaintiff's subjective complaints that appeared on a few occasions in the notes of Dr. Carro and Dr. Wright. (R. 400-03, 416-17).  The ALJ found that the Plaintiff had no mental impairment and, therefore, no severity determination was required.  Thus, the ALJ made no specific findings regarding the effect of Plaintiff's mental limitations on Plaintiff's activities of daily living or how they would affect work-related activities, because there were no findings to make: there was no evidence of any restrictions for the ALJ to evaluate concerning the functional areas of activities.[6]  Moreover, there was nothing in the record to suggest that the Plaintiff suffered from any limitations that would interfere with work-related mental activities.

---

[6] Where there is a mental impairment, during the RFC assessment at step four, an ALJ looks to the four broad functional areas of activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation, but this time to rate the degree of a claimant's functional limitation.  The written decision of the ALJ must incorporate the pertinent findings and conclusions based on this technique.  20 C.F.R. § 404.1520a(c)(4).  Moreover, as part of the nonexertional limitation assessment, the ALJ must explain how a claimant's limitations would affect work-related mental activities generally required by competitive, remunerative work that includes the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting.  SSR 96-8p.

The Plaintiff argues simply that the record supports that he had a mental impairment.  ECF No. [37] at 4.  This argument is without merit.  Plaintiff has provided no medical records or citations to the record to support that Plaintiff suffers from any mental impairment or nonexertional limitations based on his alleged mental impairment. Plaintiff refers to the Record at 200-227 to support his argument, yet these documents contain only records of treatment for Plaintiff's right knee, left elbow, and left shoulder. To the extent that these records reflect Plaintiff's mental condition, they reflect that he was always oriented in all three spheres and that his mood and affect were appropriate. (R. 201, 202, 204, 209, 211, 213, 221, 222, 226).  There is only one notation on August 15, 2006, that he appeared somewhat depressed, but he still was oriented with appropriate mood and affect.  (R. 221).

Defendant argues that a review of Plaintiff's medical files reveals that his mood and/or affect were repeatedly unremarkable; and, only once was there a mention of psychological symptoms like mood swings in his Family Physicians records. ECF No. [39] at 14.  Defendant also argues that Plaintiff never received psychological testing to ascertain whether Plaintiff's focus and concentration were impaired.  ECF No. [39] at 15. The undersigned agrees with Defendant's argument and finds that the evidence of record does not support Plaintiff's argument that he suffered from a mental impairment.

### a.    *Dr. Welch's Assessment*

The only other record that addresses the Plaintiff's mental health is the Psychiatric Review Technique from Larry W. Welch, Ed.D., a state agency reviewing doctor, dated February 26, 2007.  (R. 251-264).  The majority of the form is blank, as Plaintiff points out, but the notes section contains summaries of the medical records that Dr. Welch reviewed.  Dr. Welch considered Plaintiff's allegations of depression, anxiety, mood swings, a brain injury, and difficulty concentrating, focusing, and remembering. (R. 263).  Dr. Welch's assessment focused on the period from Plaintiff's alleged onset

disability date in July 2006, although Dr. Welch considered the evidence stemming from his alleged brain injury in 2004.  (R. 263).  Dr. Welch's notes indicate that the MRI and CT scan dated September 2004 by Dr. Deshazo were unremarkable; and that there was no diagnosis of any mental health impairments, and no referral for mental health treatment had been made.  (R. 263).  Dr. Welch noted that Plaintiff was hit in the face with a steel pipe in 2004 but continued with substantial gainful activity afterwards for two years until 2006.  (R. 263).  Dr. Welch also reports that Plaintiff failed to return certain paperwork, and that his application stated not to contact the Plaintiff.  (R. 263).  Dr. Welch wrote, "with no diagnosis and no medications of any mental health issues, it is determined that there is no mental health impairment." (R. 263).   Dr. Welch opined that Plaintiff did not have a medically determinable impairment.  (R. 251). Because Plaintiff did not have a medically determinable impairment that could cause any medically determinable restrictions, Dr. Welch did not rate his functional limitations.  (R.  251, 261-62).  The ALJ cited Dr. Welch's opinion in concluding that the Plaintiff did not have a mental impairment. (R. 23).

Plaintiff's argument that the ALJ failed to properly consider his mental health impairment is unsupported: no mental health medical evidence was provided by the Plaintiff for Dr. Welch to review and none of the Plaintiff's treating physicians ever diagnosed him with any mental health issues.  Dr. Welch noted that while Plaintiff claimed Dr. Deshazo treated him for a brain injury, Dr. Deshazo returned a letter stating specifically that he had not referred Plaintiff for any mental health treatment.  (R. 263). Dr. Wright, another treating physician of the Plaintiff, noted that Plaintiff's "cognitive complaints are exactly what are expected of someone who is constantly distracted by severe pain and is resting poor on account of that as well.  His mild concussive injury certainly would not be expected to cause post-traumatic dementia and he is certainly too young for a degenerative brain disorder." (R. 374, 432).

23

Since the Plaintiff has provided no medical records as it is his burden to do, there was no opinion from a treating physician, psychiatrist or psychologist regarding the alleged mental impairment for the ALJ to weigh.  As pointed out by the Defendant, a review of Plaintiff's medical records reflects that his mood and affect were repeatedly found to be unremarkable; there was only one observation of psychological symptoms like mood swings or crying; he was consistently oriented; and, his memory was normal. ECF No. [40] at 14.  An ALJ must consider the medical opinions that were submitted in the record as well as other relevant evidence. 20 C.F.R. §404.1527(b).  Typically, an administrative law judge must accord "substantial" or "considerable" weight to the opinion of a claimant's treating physician unless "good cause" is shown to the contrary. *Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir. 1985).  In the case at bar, however, there is no medical opinion regarding Plaintiff's alleged mental impairment by a treating physician for the ALJ to consider and there is no other relevant evidence for the ALJ to have considered that would support an allegation of mental impairment.  Nothing in the record demonstrates that Plaintiff suffered from any limitations regarding his mental health that would prevent him from working.  Thus, the ALJ found that while the Plaintiff alleged symptoms of depression and anxiety, the record did not reflect any medically determinable mental impairments.  (R. 23, 251-264).  The undersigned concurs with the ALJ's findings.

Plaintiff also argues that Dr. Welch failed to comply with the requirements of Listing 12.00 Mental Disorders.  ECF No. [37] at 7.  This argument also fails because of the lack of evidence in the record.  The Introduction in Listing 12.00A provides that

> [t]he evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.

Since there is no documentation to support the allegation of a medically determinable

mental impairment, Dr. Welch was not required to conduct further analysis.

### b.    No Consultative Exam Required

Plaintiff argues that Dr. Welch should have obtained independent medical testing

for the Plaintiff.  The ALJ has a duty to develop a full and fair record.  *Todd v. Heckler*,

736 F.2d 641, 642 (11th Cir. 1984); *Graham v. Apfel*, 129 F. 3d 1420, 1423 (11th Cir. 1997).

An ALJ may order a consultative examination to try to resolve an inconsistency in the

evidence, or when the evidence as a whole is insufficient to make a determination or

decision on a claimant's claim.  20 C.F.R. § 404.1519a.  Examples of these are:

> (1)  The additional evidence needed is not contained in the records
>       of your medical sources;
>
> (2)  The evidence that may have been available from your treating or
>       other medical sources cannot be obtained for reasons beyond
>       your control, such as death or noncooperation of a medical
>       source;
>
> (3)  Highly technical or specialized medical evidence that we need is
>       not available from your treating or other medical sources; or
>
> (4)  There is an indication of a change in your condition that is likely
>       to affect your ability to work, but the current severity of your
>       impairment is not established.

20 C.F.R. § 404.1519a(b).  The undersigned finds that none of these situations are present

in the case at bar and no consultative examination was warranted.  Plaintiff has made

limited allegations of depression and anxiety, but there is no evidence in the record,

other than his own statements to support this.  The Plaintiff never mentioned any mental

health issues at his hearing in front of the ALJ when directly asked what his impairments

were; and, for reasons already addressed within the body of this Order, the ALJ had

credibility issues with the Plaintiff's statements. (R. 34-64).   Moreover, at the hearing,

Plaintiff's counsel did not inform the ALJ that Plaintiff was seeking to add a mental

impairment as the basis for disability. *See Robinson v. Astrue,* 365 Fed. App'x. 993, 2010

WL 582617, *2 (11th Cir. 2010) (holding that the ALJ had no duty to consider impairment where neither plaintiff's disability application nor plaintiff's attorney at the hearing suggested that she was disabled based on the impairment). Plaintiff did mention in his undated Disability Report that he suffered from mood swings, he could not concentrate, focus, or remember things and listed that he had anxiety and depression; however, the mention of these conditions, without evidence of them, does not equal an impairment. (R. 150-157). *See Carter v. Astrue*, No. 7:07-cv-148, 2008 WL 4498960, *3 (M.D. Ga. Sept. 30, 2008) ("Merely noting the existence of an impairment does not make it a condition the Commissioner must analyze.").

None of Plaintiff's medical records from his treating physicians diagnose a mental impairment. The record only contains a few references to Plaintiff's own allegations of depression or anxiety. Therefore, the undersigned finds that nothing supports the necessity for a consultative exam and the ALJ committed no error in finding that the Plaintiff had no mental impairment.

## VII. EVIDENCE THAT PREDATES THE ALLEGED ONSET OF DISABILITY DATE

### A. Introduction

The undersigned finds that no error of law was committed by the ALJ who reviewed some, but not all of the evidence that predated Plaintiff's onset of disability date. In general, the claimant has the burden of obtaining his medical records and proving that he is disabled. 20 C.F.R. § 404.1512(a) and (c). The Social Security Administration has the responsibility to make every reasonable effort to develop the claimant's complete medical history, for at least the twelve months preceding the month in which the claimant filed his application and, if applicable, for the twelve month period prior to the month in which he was last insured. 20 C.F.R. § 404.1512(d); *Rease v. Barnhart*, 422 F. Supp. 2d 1334, 1372 (N.D. Ga. 2006).

Plaintiff argues that the ALJ committed an error of law and an abuse of discretion by failing to review relevant evidence that predates the date of onset of the Plaintiff's disability, July 1, 2006.  ECF No. [37] at 31-32.  Defendant does not address this directly, but instead argues that Plaintiff's brain injury was a "mild" concussive injury that occurred in 2004, which did not prevent the Plaintiff from working for years after his accident.  ECF No. [39] at 20.  Defendant further argues that the ALJ found that Plaintiff continued to work despite his migraines, which demonstrated that they were not as debilitating as he alleged; and Plaintiff could not be considered disabled if he engaged in substantial gainful activity regardless of how severe his physical or mental impairments were, according to 20 C.F.R. § 404.1520(b).  (R. 22, 24-25).

      B.   <u>Plaintiff's Onset Date</u>

Plaintiff's alleged onset date, the date he stopped working due to his "conditions" was July 1, 2006. (R. 23, 147, 151).  Plaintiff filed his Title II application on December 18, 2006, and thus, the ALJ had a responsibility to develop the Plaintiff's complete medical history starting from December 18, 2005, pursuant to 20 C.F.R. § 404.1512(d).[7]

The ALJ stated in his decision that he did not review any exhibits submitted which were dated prior to the onset date of July 1, 2006, as he found them to be irrelevant to his analysis.  (R. 27). The ALJ did not specify which records these were.

Plaintiff, however, has identified Exhibit 3F, a group of medical records from Tabor Orthopedics, P.C. found in the Record at 200-227, as the records which predated the onset of Plaintiff's condition which the ALJ failed to review. (R. 200-227).  It is

---

[7] The Plaintiff met the insured status requirements of the Social Security Act through December 31, 2009; and, the ALJ had the responsibility to consider the 12 month period prior to the month in which he was last insured, which would begin on December 31, 2008.  Since this time period was considered during the ALJ's review of the medical records, no discussion is warranted.

necessary, therefore, to review these records for relevancy to Plaintiff's impairments and for the appropriate time frame.

The Eleventh Circuit has declined to impose overly "rigid requirements" when reviewing disability decisions. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005). An ALJ need not "specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is 'not enough to enable [the reviewing court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole.'" *Id.* at 1211 (quoting *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995)). For example, in an unpublished decision, the Eleventh Circuit found, "[w]hile the ALJ could have been more specific and explicit in his findings," the ALJ's decision otherwise adequately demonstrated that he complied with the function-by-function assessment mandated under SSR 96-8p. *Freeman v. Barnhart*, 220 F. App'x 957, 960 (11th Cir. 2007). Thus, on review this Court must only decide whether the ALJ's decision contains sufficient explanation to show that the ALJ "considered [Plaintiff's] medical condition as a whole." *See Dyer*, 395 F.3d at 1211.

### C.    Medical Records Contained In Exhibit 3F

The undersigned finds that the records upon which Plaintiff relies do not support that the ALJ failed to consider relevant evidence.  The Social Security Administration discusses how evidence is considered in 20 C.F.R. § 404.1520b; in pertinent part, this section provides that "[a]fter we review all of the evidence *relevant* to your claim, including medical opinions (see § 404.1527), we make findings about what the evidence shows." (emphasis added).  Moreover, the Administration assesses residual functional capacity based on all of the *relevant* medical and other evidence, as explained in 20 C.F.R. § 404.1545(a)(3).  (emphasis added).

None of the medical records contained within Exhibit 3F upon which Plaintiff relies contain any documentation regarding migraines, head injury, or mental health

issues: 1) the Record at 201-209, dated between October 2, 2003 and February 19, 2004, contains medical records regarding Plaintiff's right knee, left elbow and shoulder; 2) the Record at 211-220, dated between February 23, 2004 and February 23, 2006, contains information regarding Plaintiff's right knee, left elbow, left shoulder, and hand joints; and, 3) the Record at 223-226, dated between April 20, 2006 and June 6, 2006, contains information regarding Plaintiff's right knee, left elbow, and left shoulder.

Only four of these records contained within Exhibit 3F are dated after December 18, 2005, the relevant period for the ALJ to have considered, as discussed above. Plaintiff has not specifically identified these four as the records that the ALJ did not review, however, by the process of elimination they are the records pertinent to this discussion.

The February 23, 2006 record from Tabor Orthopedics, P.C. address issues Plaintiff had with his left shoulder.  (R. 214).   The record documents that Plaintiff sought medical attention for pain in his shoulder that returned after a pharmaceutical injection for it the prior week.  The notes from the physical exam document tenderness over the anterior lateral portion of his acromion; pain with impingement but has full range of motion; normal stability strength, and sensation; "2+reflexes and pulses and no edema distally; there is pain with cross over testing."  (R. 214).  Plaintiff was set up for physical therapy and was set up for three week's time return visit.  (R. 214).

Another record within the relevant time frame is dated April 20, 2006 and also documents issues Plaintiff had with his left shoulder, when Plaintiff returned to Tabor Orthopedics, P.C.: it was reported in the notes that he did "not want to live with this pain any longer."  (R. 226).  The examination revealed that Plaintiff walked with normal gait; showed normal coordination; there were no skin deficits on the left shoulder; full range of motion of the shoulder, however there is tenderness toward the upper extremes of forward elevation and abduction;  tenderness over the anterior and lateral acromion; pain

with forward flexion and internal rotation; a positive Hawkin's and a positive Neer impingement test; negative O'Brien's sign; pain with cross over testing and pain with palpation over the AC joint. (R. 226). The examining physician found that there was otherwise normal stability, strength, and sensation; "2+ reflexes" and pulses and no edema distally; good strength against resistance with regard to external rotation and supraspinaturs testing; negative Jobe's relocation maneuver. (R. 226). Plaintiff was diagnosed with left shoulder impingement and AC joint arthralgia. (R. 226). Plaintiff was offered an injection, which he declined, and decided that he wanted to proceed with surgery. (R. 226).

The record dated May 9, 2006, documents Plaintiff's visit to Tabor Orthopedics, P.C. after his surgery on his left shoulder. (R. 225). Plaintiff reported that he was "doing great." (R. 225). It was noted that he had some occasional pain and discomfort as expected, but he was not taking pain medication. (R. 225). He had essentially a full range of motion of the shoulder with well healed incisions with minimal edema. (R. 225). Plaintiff was scheduled for "post operative rehab for his rotator cuff and periscapular strengthening." (R. 225).

The record dated June 6, 2006, documents issues Plaintiff had with his **left shoulder, left elbow, and right knee. On that date,** Plaintiff returned to Tabor Orthopedics, P.C. complaining that his right knee and left elbow were bothering him. (R. 223). His left elbow showed tenderness over the lateral epicondyle; pain with resisted wrist extension on the left; and right knee showed crepitus and tenderness throughout the range of motion. (R. 223). Plaintiff received injections of Lidocaine, Marcaine, and Depo Medrol into his right knee; and an injection of Depo Medrol and Lidocaine into his left elbow. (R. 223). While Plaintiff did not complain of his left shoulder, it is noted in the record that he had "[l]eft shoulder impingement, status post SAD, DCR, doing well." (R. 223).

In Plaintiff's undated disability report, Plaintiff identified that the illnesses, injuries, or conditions that limited his ability to work as "[a]nxiety, depression, headaches impairment, left rotator cuff impairment, brain injury, left and right ankle impairment."[8]  (R. 151).  In the hearing before the ALJ, Plaintiff only identified his migraine headaches as his impairment.  (R. 36).  With the exception of the Plaintiff's left rotator cuff/left shoulder, no other relevant condition appears in the medical reports contained within Exhibit 3F to which Plaintiff relies for his argument; as discussed above, the records only document Plaintiff issues with his left shoulder, left elbow and right knee.  (R. 214, 223, 225, 226).

### D.    The Plaintiff Suffered No Prejudice

The undersigned finds that the evidence regarding Plaintiff's left shoulder contained within the four of the medical records in Exhibit 3F dated after December 18, 2005 was peripherally relevant to the issue of Plaintiff's medical impairments as a whole; and, these records reflect that Plaintiff reported that he was "doing great" after his shoulder surgery.  (R. 225).   None of these records, however, support that the Plaintiff suffered from a severe impairment, and would not have changed the outcome of the ALJ's decision.  Moreover, the records do not contain the type of enlightening information that provides necessary background to place Plaintiff's medical conditions into context.  *See Homrighouse v. Astrue*, No. 5:08–cv–374–Oc–GRJ, 2009 WL 3053705, *9–10 (M.D. Fla. Sept. 18, 2009); *Schiano v. Astrue*, No. 07–61920–CIV, 2009 WL 1770152, *4 (S.D. Fla. June 23, 2009).

---

[8] Plaintiff also stated that he worked as a police officer from January 1986 through January 2003 approximately 12 hours per day, five days per week.  (R. 152).  During this time period, Plaintiff carried body gear all day long for varying distances and lifted up to 150 pounds.  (R. 153).  Plaintiff worked as a recruiter/trainer from January 2003, through January 2006, approximately 12 hours per day, five days per week.  (R. 152).

In determining whether remand is necessary for an ALJ failing to develop the record, the court considers whether the record a whole reveals evidentiary gaps which result in unfairness or clear prejudice. *Ellison v. Barnhart*, 355 F. 3D 1272, 1275 (11th Cir. 2003) (before ordering a remand, the court will review the administrative record as a whole to determine if it is inadequate or incomplete or shows the kind of gaps in the evidence necessary to demonstrate prejudice). Accordingly, there must be a showing of prejudice before the court will find that the claimant's right to due process has been violated to such a degree that the case must be remanded to the administrative law judge for further development of the record.

The ALJ's decision supports that he did review at least one of the records located within Exhibit 3F; the ALJ specifically references a medical record dated November 2003 from Dr. Lonergan at Tabor Orthopedic, P.C. regarding Plaintiff's shoulder and left arm condition. (R. 26, R. 202). It is unclear, therefore, whether the ALJ considered all or just part of Exhibit 3F. It becomes more unclear, given the contradictory statement of the ALJ that "[a]s for any exhibits which were dated prior to the onset date, the undersigned has not reviewed them as they are irrelevant to the present analysis." (R. 27). This sentence may or may not have been a scrivener's error, however, the ALJ's decision supports that he did review at least one record that predated Plaintiff's onset date.

The quality of the evidence contained within the four records dated after December 18, 2005, as well as the totality of Exhibit 3F overall fail to support Plaintiff's cause. Plaintiff argues that the "medical treatments for his conditions prior to July 1, 2006, which, when associated with traumatic brain injury, are highly variable and may take time to fully manifest to the level of permanent disability." ECF No. [37] at 32. The evidence in the record overall supports that Plaintiff did not have a traumatic brain injury. Plaintiff's physical orthopedic ailments which are contained within Exhibit 3F improved greatly after treatments, surgeries, and the passage of time as documented in the more

32

recent medical records. Specifically, the records located within Exhibit 3F do not support that the Plaintiff had a severe impairment or combination of impairments to support a disability finding.

Moreover, the ALJ made the finding that the Plaintiff suffered from the severe impairments carpal tunnel syndrome, migraines, and obesity. (R. 23). Substantial evidence in the record supports these findings. The medical records contained in Exhibit 3F to which Plaintiff cites to support his argument do not reference any of these conditions. Prejudice "at least requires a showing that the ALJ did not have all of the relevant evidence before him in the record . . . or that the ALJ did not consider all of the evidence in the record." *Kelley v. Heckler*, 761 F.2d 1538, 1540 (11th Cir. 1985). As mentioned above, it is unclear how many of the records with Exhibit 3F that the ALJ reviewed.

To the extent that the ALJ did not review any of the records dated after December 18, 2005, the date 12 months prior to the Plaintiff's application for benefits, and prior to Plaintiff's onset of disability date of July 1, 2007, the undersigned finds that any such error was harmless as the Plaintiff has suffered no prejudice.

## VIII.   TESTIMONY OF VOCATIONAL EXPERT

### A.   Introduction

The undersigned finds that the ALJ did not commit an error of law in relying on the testimony of the vocational expert. At step five, the Social Security Administration has the burden to provide evidence that demonstrates that other work exists in significant numbers in the national economy that the Plaintiff can do. 20 C.F.R. § 404.1520(a)(4)(v). There are two ways in which an ALJ may determine whether other jobs exist in the national economy that a Plaintiff is able to perform. The first is by use of the Medical-Vocational Guidelines published in the Code of Federal Regulations, 20 C.F.R. pt. 404, subpt. P, app 2. ("the Grids"). The second way is through the use of a vocational

resource.  *Phillips v. Barnhart*, 357 F.3d 1232, 1241-42 (11th Cir. 2004); *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In the case at bar, the ALJ used a vocational expert ("VE").

### B.  Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO")

The Plaintiff argues that the ALJ committed an error of law by relying on the testimony of the VE because the VE did not provide any documentation, specifically the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO") or the Classification of Jobs, to support her testimony that the position of gate guard in the light work category could be held by the Plaintiff.  (ECF No. [37] at 36).  Defendant argues that the SCO is the companion to the Dictionary of Occupational Titles ("DOT"); and, the DOT number for the gate guard job, which the VE provided, gives a complete description of the occupation in the DOT and the SCO.  *See* (R. at 61).  The undersigned finds that the ALJ made no error in relying on the testimony of the VE.

The DOT lists the occupation of gate guard as follows:

> 372.667-030  GATE  GUARD  (any  industry)  alternate  titles: gatekeeper; guard; watch guard, gate
>
> Guards entrance gate of industrial plant and grounds, warehouse, or other property to control traffic to and from buildings and grounds: Opens gate to allow entrance or exit of employees, truckers, and authorized visitors. Checks credentials or approved roster before admitting anyone. Issues passes at own discretion or on instructions from superiors. Directs visitors and truckers to various parts of grounds or buildings. Inspects outgoing traffic to prevent unauthorized removal of company property or products. May record number of trucks or other carriers entering and leaving. May perform maintenance duties, such as mowing lawns and sweeping gate areas. May require permits from employees for tools or materials taken from premises. May supervise use of time clocks for recording arrival and departure of employees [TIMEKEEPER (clerical) 215.362-022]. May answer telephone and transfer calls when switchboard is closed. When stationed at entrance to

> restricted area, such as explosives shed or research laboratory, may be designated Controlled-Area Checker (any industry). *GOE: 04.02.02 STRENGTH: L GED: R3 M2 L2 SVP: 3 DLU: 80*

U.S. Dep't of Labor Emp't & Adm'n, *Dictionary of Occupational Titles*, (4th ed., 1991). DOT codes are comprised of nine numbers subdivided into three sets containing three numbers; and in the classification system contained within used in the DOT, each digit has a specific purpose or meaning. *Id.* Together, these nine numbers provide a unique code which identifies an individual occupation from all others listed in the DOT. The SCO provides more detailed occupational data than that contained in the DOT. Moreover, contained within the SCO is a key that provides a single reference location of the codes and headings, and an explanation of the Occupational Code Numbers. *See* U.S. Dep't of Labor Emp't & Training Adm'n, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* 617 (1993).

The undersigned looks to the Social Security Regulations for guidance. SSR 00-4p provides the standards for the use of vocational experts who provide evidence at hearings before ALJs, vocational specialists who provide evidence to disability determination services adjudicators, and other reliable sources of occupational information in the evaluation of disability claims. SSR 00-4p. The ALJ takes administrative notice of "reliable job information" available from various publications, including the DOT, according to 20 C.F.R. §§ 404.1566(d) and SSR 00-4p. An ALJ must resolve any conflict between the evidence provided by a VE and the occupational information supplied by the DOT. SSR. 00-4p.

Plaintiff argues that the VE did not provide any supporting documentation of the job description of gate guard. ECF No. [37] at 36. The undersigned disagrees. Plaintiff cites to no legal authority that requires additional evidence to be provided to support a VE's conclusions other than the DOT or SCO. In fact, SSR 00-4p states that in making

disability determinations, the Social Security Administration relies primarily on the DOT and its companion publication, the SCO, for information about the requirements of work in the national economy.  SSR 00-4p.

The VE testified that the Plaintiff could perform the position of gate guard, she added that "he would have the skills to qualify for both the unskilled and the semiskilled jobs, Your Honor, numbers would be for the U.S., 190,000, hang on, I'm getting Georgia, about 1,000 in the state of Georgia."[9]  (R. 61).  The ALJ questioned her, "did you check the SCO to make sure that we're not inconsistent with any of their, their little categorizations as far as the characteristics of the occupation?"  (R. 61).  The VE responded that she used the Classification of Jobs which is another version of the SCO. (R. 61).

Moreover, the ALJ asked the VE if her testimony was consistent with the DOT and the SCO, to which she answered in the affirmative.  (R. 62).  Plaintiff's counsel then proceeded to question the VE, but did not question her regarding the need for any supporting documentation, as Plaintiff now argues was missing.  (R. 62-63).  Counsel raises this issue for the first time in his Motion for Summary Judgment.  ECF No. [37] at 36.

The Seventh Circuit has required a VE to "make his or her data 'available on demand' if it is challenged." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 449 (2d Cir. 2012) (*quoting McKinnie v. Barnhart*, 368 F. 3d 907, 911, 65 Fed. App'x. 80 (7th Cir. 2004).  However, "[i]n contrast to the Seventh Circuit's approach, other courts have held

---

[9] Plaintiff raises the argument that the ALJ "failed to give testimony regarding the 'about 1,000' in the state of Georgia referenced by the ALJ."  ECF No. [37] at 36. The Plaintiff does not further elaborate.  This sentence is the only reference to the argument; and, there is no legal support for whatever Plaintiff's assertion is.  Plaintiff does not elaborate on this argument and it is unclear to the undersigned what the Plaintiff means. Defendant does not address it in their Response.  As the intent is not clear on the face argument, and as Plaintiff has provided no discussion, the undersigned finds that Plaintiff has failed to state a cognizable argument and no further analysis is required.

that '[a] VE's recognized expertise provides the necessary foundation for his or her testimony.  Thus, no additional foundation is required.'"  *Pritchett v. Astrue*, No. 5:09-CV-144 (CAR), 2009 U.S. Dist. LEXIS 112814, 2009 WL 4730326, at *3 (M.D. Ga. Dec. 4, 2009) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005)). *See also Jones v. Apfel*, 190 F.3d 1224, 1230 (11th Cir. 1999) (finding an ALJ may rely solely on the VE's testimony).  In the case at bar, however, Plaintiff's counsel never questioned the VE regarding additional information or documentation needed.

Moreover, a VE's testimony in response to an accurate hypothetical represents substantial evidence that the claimant has the vocational qualifications to perform specific jobs. *Dyer v. SSA*, 568 F. App'x 422, 428-29 (6th Cir. 2014) citing *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001) (citing *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)). *See Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009) (where the administrative law judge has already fulfilled his obligation to ask the vocational expert whether his testimony conflicts with the Dictionary of Occupational Titles, the judge need not independently investigate conflicts in vocational expert's testimony not brought to the judge's attention).

In the case at bar, the ALJ later made the finding that the VE's testimony was consistent with the information contained in the Dictionary of Occupational Titles.  (R. 28).  Plaintiff's assertion that the ALJ erred in relying on the VE's position of gate guard "without supported evidence of what the SCO's were" is misplaced, since ALJ properly made his findings in reliance on all of the evidence in the record.

## C.    Evidence of Plaintiff's Ability to Perform Work

The Plaintiff argues there is a lack of evidence regarding employment available to someone with the Plaintiff's disabilities and restrictions.  ECF No. [37] at 26-28, 36.

Specifically, the Plaintiff refers to the VE's testimony in response to Plaintiff counsel's questioning regarding a hypothetical individual's ability to perform the gate guard position who:

> would require frequent rests at unscheduled intervals due to headaches and may miss three days or more per month due to the frequency and intensity of headaches.

(R. 26-27).  To Plaintiff counsel's hypothetical, the VE responded that "three absences per month would exceed what an employer would tolerate..." (R. 26).  Plaintiff counsel then questioned the VE regarding an individual whose attention and concentration was "frequently interrupted for five to ten minutes at a time throughout the day."  (R. 27).  The VE responded that "that would not permit working as a gate guard."  (R. 27).  Plaintiff's counsel's hypotheticals were based on the Plaintiff's complaints; and, Plaintiff's argument ignores the ALJ's hypotheticals that were supported by substantial evidence within the medical record.

As discussed below, since the ALJ's hypotheticals were based on the RFC determination he made, and incorporated all of those limitations, it was appropriate for the ALJ to rely on the VE's testimony regarding available jobs based on the ALJ's hypotheticals.  As argued by the Defendant, relying on *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989), the ALJ is not required to accept the unsupported testimony of a claimant in questioning the VE regarding available jobs.  Since the medical evidence does not support these restrictions, and the ALJ found that the Plaintiff's testimony regarding the limiting effects of his disability was not entirely credible, the ALJ was not obligated to rely on the testimony given by the VE in response to the hypotheticals posed by the Plaintiff's counsel.

During the ALJ's RFC assessment, he found that Plaintiff could perform a modified version of light work, which was supported by substantial evidence. The ALJ had credibility issues with the Plaintiff's testimony regarding his subjective symptoms; it

is these subjective symptoms upon which Plaintiff's counsel relied when posing hypothetical questions to the VE.  Plaintiff counsel's hypothetical individual possessed greater RFC limitations than those actually possessed by Plaintiff.  Thus, the ALJ committed no error in disregarding this portion of the VE's testimony.  *See Gionfriddo v. Colvin*, No. 12-381, 2013 WL 4493939 at *11 (M.D. Fla. Aug. 20, 2013) (finding the ALJ committed no error by disregarding the testimony of a vocational expert regarding an individual with greater RFC limitations than plaintiff, but correctly considered it in determining that plaintiff was not disabled.).

The ALJ was not required to give further consideration to the answers given by the VE to Plaintiff's counsel's hypotheticals that were unsupported by the evidence in the record.  *See Adams v. Barnhart*, No. 05-291, WL 6142859 at * (W.D. N.C., August 21, 2006). The testimony of a vocational expert in response to a hypothetical question may serve as substantial evidence of a claimant's vocational qualifications to perform certain jobs. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  However, the hypothetical question posed to a vocational expert must accurately portray the claimant's physical and mental state. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002).  Since hypotheticals posed to the VE by Plaintiff's counsel did not accurately portray Plaintiff's physical and mental state, the ALJ committed no error in relying on his own hypotheticals which did.  The undersigned finds that the ALJ has committed no error of law regarding consideration of the VE's testimony.

IX.    <u>CONCLUSION AND RECOMMENDATION</u>

Based on the foregoing analysis, the undersigned Magistrate Judge concludes that the decision of the ALJ that Plaintiff was not under a disability is supported by substantial evidence in the record, and the ALJ applied the correct standards of law.  It is clear that the Plaintiff has long suffered from migraine headaches as well as the severe impairments of carpal tunnel syndrome and obesity as found by the ALJ.  The

undersigned, however, is constrained by the ALJ's factual determinations, supported by the record, that the Plaintiff's complaints of the limiting effects of these symptoms was not credible.  A determination of disability "requires more than the mere inability to work without pain."  *Wall v. Astrue*, 561 F.3d 1048, 1068 (10th Cir. 2009) (internal citation omitted).  Therefore, in accordance with the above, it is hereby

ORDERED AND ADJUDGED that the Plaintiff's Motion for Summary Judgment, ECF No. [37] is DENIED, that Defendant's Motion for Summary Judgment, ECF No. [39] is GRANTED, that the decision denying benefits is AFFIRMED, and that FINAL JUDGMENT will be entered in favor of the Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security Administration.

DONE AND ORDERED in chambers in Miami, Florida on September 30, 2015.

Andrea M. Simonton
_____
ANDREA M. SIMONTON
UNITED STATES MAGISTRATE JUDGE

Copies furnished via CM/ECF to:

All counsel of record